So the first case on our list is two cases or companion cases United States versus Perrin 22-2196. United States versus Montgomery 22-2368. Mr. Donohue. You're here for Mr. Perrin, is that correct? That's correct, Judge. Good morning and may I please the court. Keith Donohue from the Defender's Office for Appellant James Perrin. I'd like to reserve two minutes of my time if I may. Your honors, the first question presented on this appeal relates to a central safeguard in the federal wiretap law known as Title III and a Pennsylvania enactment that buttresses that central safeguard. We cut right to your arguments and the issues you've raised because as I understand it, you have raised before us an argument that 2516 subsection 2 under Title III requires a principal prosecuting attorney to personally review a wiretap application. That's your issue, right? Yes. Where did you raise that in the district court? That argument wasn't raised in the district court. You waived it? It's within the scope of Rule 12's waiver rule, yes. So the court may excuse the waiver if good cause is shown. What's the good cause? It's multifold, your honor. I think the two most... You have a statute and those words don't appear anywhere. It'd be pretty easy to insert a requirement of personal review of the application, wouldn't it? Congress clearly didn't intend it. Your client in the district court didn't raise it. It should be out of this case. Why is it plain then? Let's get to plain error since you didn't waive it. Why is it plain? It is plain in terms of the initially text of Title III, which refers to the principal should be personal review by the attorney who's looking at the application. It states that the principal prosecuting attorney may apply for a wiretap, and this is after Giordano in 1974 interpreted analogous language in the neighboring provision of Title III to in fact limit wiretap authority to the named officials. Giordano was interpreting the companion federal provision, so the name... I don't think that's answering the question that is one... Judge McKee asked you about plainness, so we look right to the statute, don't we? Shouldn't we be looking right to the subsection of 2516? That's where we should start. There's no limitation to the text of a statute. So we should just make something up beyond what Congress gave us in the statute, and therefore this is plain. No, Your Honor, shouldn't make something up, and I think I'm by no means stretching Congress's intent on the statute, which Giordano discusses at length as being an intent to centralize authority. But I would note, Your Honor, while the error was plain, because this is a Rule 12 issue... Put the rabbit in the head. I'm asking you why is it plain? Your Honors, I'm telling you it's... We begin with the text, which states that the principal prosecuting attorney may apply for a warrant. If it's the principal prosecuting attorney who applies, it must be the principal prosecuting attorney who decides whether the application goes forward. And Title III requires that the decision on whether to go forward with a wiretap application rests on certain criteria, and to assess those criteria, it's necessary for the principal prosecuting attorney to familiarize herself with the details of the case in order... You have a situation where the principal prosecuting attorney authorized, not in writing, but verbally authorized her deputy to apply for a wiretap. So, again, why is it plain? If there's been a verbal authorization, why isn't that tantamount to the principal prosecuting attorney making the application for the wiretap? Because the decision to make the application has to be done in terms of Title III's prerequisites. Before we leave this issue, under our precedent in Joseph, this is an argument that you had to raise in a suppression proceeding. Joseph was a suppression proceeding, and it said that you have to raise the specific argument. Now, I realize that doesn't answer for you, the plainness issue, but I have to say, for me, the complete absence of a requirement that you would read into the statutory text does answer the plainness issue. Your Honor, if I may step back, I do believe the error is plain, but because we are under Rule 12 here, in fact, the plain error standard does not apply. That is what the court just held in the United States PSOC last month. So, what we're looking at is the good cause standard that's Rule 12, which states that an untimely argument, such as this one, may be entertained if there is good cause. PSOC exhaustively canvassed what this good cause standard means and pointed out that it supplants Rule 52 and set forth a range of considerations that bear on whether good cause appears. It said it's a flexible standard that takes account of all considerations in the case. In this case, there are two unusual considerations that we submit supply good cause. One is that there is no prejudice to the government whatsoever from the non-raising of this argument below. The government has not contended its prejudice in its briefing on this appeal, and the reason why it hasn't is because all conceivable facts bearing on this issue have been fully developed. There just aren't other facts out there to be found. So, that's one distinction between this case and many that it's a multi-factor test, but we believe tends to support good cause and that there's no prejudice to the adverse party. Another unusual factor that distinguishes this case from most is how closely related the argument raised on appeal is to the argument that was raised in the district court. They both have to do with the role of the principal prosecuting attorney, and that likely had something to do with why the record is so complete for the issue we have now. I take you forward because I'm looking at the light, and we want to make sure that we're covering all your arguments. Substantial compliance looms large in this case, right? I mean, whether you call it a principle or a doctrine, that's how the district court analyzed it. It has resonance in Supreme Court law, Chavez, and in our own jurisprudence traits, right? Yes. So, ultimately, we're looking at substantial compliance, and Judge Hornak made numerous findings in his opinion that supported, in his view, substantial compliance with the statute here. Where's the weakness with his application of findings, the fact he made to the procedure that had to occur under the statute, such that substantial compliance was not demonstrated? We would draw the line on substantial compliance at a different spot. So, we would say substantial compliance allows for an assistant to sign the application, get the application in front of a judge. The principal prosecuting attorney doesn't have to necessarily be there in court. That would actually be compliance. You're accepting that substantial compliance can satisfy the requirements? When substantial compliance is defined to mean that the principal prosecuting attorney makes the call by looking to title. So, what's the inflection point here? Where did it go wrong? That the Attorney General Kane never read the application for wiretap, nor familiarized herself in some other fashion. She wouldn't have to if the designation was effective, right? That's true as far as the state of the law claim goes. I mean, one controls, right? Either she has the responsibility, or she's absent, and someone else designated somehow, perhaps by statute, perhaps by a writing from her, perhaps as a matter of public policy in Pennsylvania, since this was a Pennsylvania hard right? Wasn't it the public policy as expressed through the administrative procedures of the Commonwealth, as well as the Commonwealth Attorneys Act, that the principal deputy, the deputy Attorney General, would take over in the absence of the Attorney General? It's a matter of Pennsylvania public policy. As a matter of Pennsylvania administrative law, there is that provision. Well, that would be an expression of public policy, wouldn't it? As is the wiretap statute that addresses the specific issue here. Well, the wiretap statute talks about a designation, too. Right. And that's the written designation issue. So, that's the second problem. There's no requirement for a signed designation, right? It only needs to be in writing. A written designation, that's correct. I think an email would suffice, so far as the state law claim goes. So, we're not trying to... Not a testimony found to be credible that the Attorney General herself, in fact, authorized and designated the Deputy Attorney General to act in her stead. No, I think there is a significant difference between an email or some form of documentation. And to ask if there was a difference. Obviously, my question is, doesn't that suffice? I don't believe it does suffice. You're stuck with that finding of fact. Now, either it means something or it doesn't mean something. It certainly means something, Your Honor. But I think the fallout from this case is still such that we'll never have as much certainty as the Pennsylvania statute contemplated by requiring there be a written designation. If that were what had happened, there wouldn't have been a need for this three-day suppression hearing. And of course, it's a... The entire transcript, it was excruciating. Yes. So, we are where we are. The fallout of this case leaves... We have two people saying different things. The judge made his factual decision and we don't challenge it as clearly erroneous. But unfortunately, the matter can never be settled with the degree of certainty that Pennsylvania statute contemplated. I see that my time is up, Your Honor. I don't know if you wish to hear about the second issue. No, please do. We exhausted the time with the wiretap issue. Go ahead. The second issue is the constructive amendment of count five, charging a 924C possession and furtherance offense. Yeah. Maybe you're getting there, but... And I'm not a big harmless error fan, but given the evidence here, why isn't that constructive amendment, right? I think even your colleague would concede there was a constructive amendment. Why doesn't that harmless error, given what the jury had to have found, I guess under code eight or code seven, but given the nature of the evidence here, why isn't that a harmless error? Because the entire case was directed toward other contentions as to why my client, Mr. Perrin, possessed a gun. There was attention to a transaction in January, 2013, which is separate from the charge that was in the indictment taking place on June 8th, 2014. And the evidence on June 8th was much weaker than the evidence of the- But if the evidence here is sufficient to make him a member of the conspiracy or even better, doesn't that basically come back and spackle over that issue? As a matter of the sufficiency of the evidence, it could, Your Honor, on a Pinkerton theory, but it becomes significantly more complex. When we look at the AUSA arguing on rule 29 motions below with respect to Mr. Perrin, he talks about how, well, we know that Mr. Perrin was sometimes in the house alone. So we can infer that on those occasions, he had the opportunity, constructive possession of these guns, which were stashed away in Price Montgomery's home. So the AUSA at that point is straining for some occasion other than June 8th, that there'd been testimony where Perrin was in the home alone. On June 8th, he was in the home for 90 minutes with Price Montgomery. What do we make of the agreement between counsel with respect to the jury instructions? I think the record- Nobody agreed that this was the appropriate jury instruction. Yes, I agree to the styling of these as the joint proposed instructions. And nobody objected to it. And they never objected. Well, not only did they not object, Judge Hornac was very careful in including an instruction to counsel to point out to him where they did not agree. Did he not? I trust he did, Your Honor. There's no doubt that counsel made a mistake here and should have corrected it, should have responded to that inquiry from the court. But what the record shows is that it was an inadvertent lapse. It's very similar to the case of Government of Virgin Islands v. Rosa, which also involved a jury instruction, and where the appellant adopted his co-defendant's instructions. The court said, do you agree these all apply to your client? Counsel for appellant said yes. He also said three times that he was satisfied with the charge as a whole. And this court on appeal, noticing that the record showed that counsel simply hadn't apprehended the correct rule, charged a forfeiture instead of a waiver and reviewed for plain error. Here too, it's impossible to see the agreement that defense counsel entered into as anything other than inadvertence, because it was something that my client had absolutely detracted from his case. It left him with a much lesser defense. We are within a plain error. We are in plain error with the government relying only on prong four, not disputing any of the other prongs. And prong four ordinarily might have some real heft here if there were some sign of sandbagging, for example. But as I've been describing, it's a problem of inadvertence, not sandbagging. Or in a case that the government relies on heavily called greenspan, plain error might have some teeth if this nature of this variance were so minuscule, if it was the difference between a few payments and a fraud scheme, which was the situation in greenspan. But here there's a wide gulf between the single day substantive offense that was charged in the indictment and the 15 months conspiracy that was put forward at trial as the predicate for the 924 C. So it really bears no resemblance to the case that the government has said calls for a denial of a remedy at prong four. Thank you. Thank you. Morning, Mr. Austin. Good morning, Your Honors. Evan Austin with the Office of the Federal Public Defender on behalf of Price Montgomery. I'd also like to reserve two minutes for rebuttal.  Thank you. Your Honors, I'd like to start with the Apprendi issue on count seven. As this court has explained, a sentencing error under Apprendi occurs when a defendant is charged with and convicted of one crime, but sentenced for another. That is exactly what happened in this case. Mr. Montgomery was charged with and convicted of a manslaughter offense on count seven. I'm sorry, convicted. Say it again, please. I was saying, Your Honor, that Mr. Montgomery was convicted of a manslaughter offense on count killing a federal witness without malice before thought, but was then sentenced for first-degree murder. And that error rose to the level of constitutional significance because it dramatically increased the statutory penalties. No question it increased the statutory penalties, and no question that there was an error here. But the concern and policy behind Apprendi was that certain facts be found as such by jury, correct? Your Honor, I would say that is certainly one of the concerns focused on by Apprendi, but Your Honor's opinion in Lewis, there's also a concern about notice. Surely, but my recognizing that we're focusing right now on how the jury was instructed, and perhaps more to the point, or as part of that, what the verdict slip set forth. The jury necessarily had to find, did find, both premeditation and malice before thought here in convicting Montgomery on count eight, right? Your Honor, that was a component, that was an element of the charge in count eight. It was charged in count eight, Your Honor, but I would dispute that it was actually found. And they found, the jury found him guilty. The jury did find him guilty, Your Honor. Where the problem lies, and this was our alternative argument, is that there was not a proper instruction of first-degree murder on count eight. So the words malice before thought and premeditation were mentioned in the jury instructions, but they were never defined. Why isn't it Stevenson then, the same issue? Johnson's a little bit different because there, one count incorporated, the count that didn't include the crackdown, incorporated the count that did, but Stevenson didn't. Stevenson is more like this case. Now, why doesn't that case cause us to come out against you? Your Honor, I believe so. Stevenson was about the sufficiency of the indictment in that case, and the court found that although there was not incorporation, the indictment was sufficient because it charged the element by implication. Here, the elements were not charged by implication in count seven. They simply- But they were in count eight. It was specific as to count eight. Yes, Your Honor, they were charged in count eight, and our position is that's not sufficient. And the reason that's not sufficient is, one, there's a huge notice problem. Because the elements were not charged on count seven, that changed the offense that was charged in count seven. What element was not charged in count seven? Malice of forethought and premeditation, Your Honor. Which was charged in count eight, instructed upon, and count eight was one of the counts of conviction. Yes, and Your Honor, so just to get to the jury instructions on count eight, because this gets to whether the jury found first-degree murder on count eight, it was not sufficient because malice of forethought and premeditation were not defined. And every circuit that has a pattern jury instruction on first-degree murder under 18 section 1111 defines those terms. They're not self-explanatory. Those are specific legal terms of art that have specific definitions, and they were not defined on count eight. And it gets us back to the other discussion that there's no objection to the jury instruction on count eight. That is correct, Your Honor, and that is one of the reasons why we did not raise the jury instructions on count eight as an independent issue. I raised that in response to the government's contention that there was no apprendee error on count seven because of the purported finding on count eight. And my contention is there was not a proper finding on count eight, but Your Honors, I would also stress that even if the court believes there was a finding by the jury on count eight, that is not sufficient. That would not work in practice because that would essentially be saying someone can be charged with an offense that carries certain statutory penalties and not receive notice through the indictment that they're facing life sentence on that count. But then based on a jury finding on another count that was not incorporated under the federal rules, all of a sudden they're facing a life sentence on that count. That is not the notice that the Constitution and the federal rules require, as Judge Smith, you explained in your concurrence in the Lewis case. So we believe that there was an error here. There was not adequate notice on count seven that there was a mandatory life sentence. It was charged as a manslaughter offense, and therefore it was required to be sentenced as a manslaughter offense. And if the court wanted to impose a life sentence on other counts, it had the ability to do that because of the statutory maxima, but it could not impose a mandatory life sentence on count seven because that was not the proper statutory penalty for that count. If Your Honors don't have any other questions on that issue, I'd be happy to move now to the sufficiency of the evidence on count nine. And I want to make two primary points on this, Your Honor. Well, let me ask you about count nine. Sure. I understand the sufficiency argument you made. What evidence on the record supports the inference that this particular woman was a witness and that she intended to, that he shot her, intended to prevent her from communicating? And that Montgomery knew she was a witness. Right. What evidence is there in the record? Is there any? Your Honor, I would say that there is no evidence in the record that Mr. Montgomery knew that Patsy Crawford was going to be present that day, that she was somehow going to be a witness. So why isn't it appropriate inference for a jury to draw that the defendant was confronted with a situation where he had to eliminate witnesses to two events, the shooting that was taking place of Patsy Crawford's daughter, Tina, and the killing, the shooting of Tina, or her role in the drug conspiracy and the fact that she'd gone to talk to the feds? Your Honor, I think the reason why that would not be a reasonable or an appropriate inference for the jury to draw is there simply was not enough evidence about what happened during the shooting. The government's only witness to the shooting was Gwendolyn Saunders. You have a really, really steep climb, don't you, given the jurisprudence of this court, to overturn the jury's verdict on sufficiency grounds here. Yes, Your Honor. That's absolutely true. But there still needs to be, as the court has said, substantial evidence to support a conviction on account. And as I believe Judge Restrepo and McKee's questions indicate, this particular federal offense has a very specific mens rea. It's the intent to kill a person with the intent to prevent them from providing information to law enforcement about a federal offense. And, Your Honor, due to the lack of evidence about what happened during the shooting, we don't know, for example, whether Patsy Crawford was shot before Tina Crawford, where Patsy Crawford was shot. What difference does that make given what this court has said in Caraballo-Rodriguez in repeating the bare rationality test? That's what I was referring to as being the steep, steep climb. Yes, Your Honor. What difference it makes is, so there are two ways that Mr. Montgomery could have been convicted of this offense, right? He could have been convicted as a principal. In other words, the person who actually shot Patsy Crawford. And as Judge Hornak found, it would be extremely difficult, the quote was very difficult for a jury to conclude that he was the person who actually shot her. The other alternative, Your Honor, is that he would be convicted as an accomplice. But in order to be convicted as an accomplice, he needed to have the specific intent to facilitate that crime. And why bring up the order of the shooting, Your Honor? If Patsy Crawford was shot first and immediately, which is entirely possible on this record, Mr. Montgomery did not have the time to form the intent, the specific intent for that crime to occur. If one of his confederates shot Patsy Crawford. Is it enough time? Your Honor, I think what the Supreme Court said in Rosemond is enough time is, it requires enough time for the person to make a conscious decision to aid the offense or to withdraw from it. What if he was a very quick thinker, especially in terms of determining what the implications were to witnesses? Your Honor, I would just say that I think that that would be, there would be a lot of levels of speculation about what happened and how it happened in the timing. And that is not proof beyond a reasonable doubt as to Mr. Montgomery's mens rea and his specific intent that not Tina Crawford, but that Patsy Crawford, who the government even admits, or the government argued in closing, she was at the wrong place at the wrong time. And that's the government's theory. That's the government's theory, Your Honor. And wrong place, wrong time is not a theory that supports this idea that it was an intentional killing or attempt to kill Patsy Crawford with a specific intent as to her cooperation or providing information. Your Honor, I see that my time is up. I'm happy to briefly address the third and final issue. Please do. Thank you, Your Honor. The third issue is the Laura Erron County. And the error there is that the district court believed that there was a mandatory consecutive 25 year sentence. He was wrong. He was wrong. To cut to the chase, maybe I'm being simplistic here, but it really seems to me that the government hasn't let this one go as they certainly could. Their argument seems to be that, well, this guy's going to be in jail effectively for the rest of his life. So what difference does it make if he's been illegally sentenced on account? Isn't that what this amounts to? I agree, Your Honor, that that is the government's argument. I'm very interested in hearing the government's explanation for why they have persisted in that argument. That is the government's argument, Your Honor, and I don't agree with that argument, of course, for a few reasons. Neither do I. I'm glad to hear that, Judge. I'm glad to hear that too, Judge. We have less time to spend in conference, apparently. Then I'll be brief, Your Honors. Look, I think that we are challenging a number of- Do you agree with us? I agree with the panel. I do. Unless the court has any further questions- Are you going to pull the feet from the jaws of victory? That would not be a good idea. I appreciate it and I'll be back on rebuttal. Thank you, Your Honors. Mr. Hale, why'd you start when we left off? Good morning, Your Honors. May it please the court, Matthew McHale for the United States. The argument is essentially, as Judge Schnitt described it, it is, as we explained in our brief, the defendant has to show some prejudice and some difference in the outcome here, and given the other sentences- Inherently some prejudice in having an illegal sentence on your record? Perhaps, Your Honor, but-  Perhaps. Give me a scenario where that would not be prejudicial. Your Honor, the argument that we've taken, the position we've taken in this case, is that if he is going to be in prison for life plus 85 years, it's not going to make a difference. And whether you call it- Well, that doesn't make the sentence imposed any more correct. It certainly has a bad appearance. Maybe you'd be better spending your time on one of the other issues. I appreciate that, Your Honor. Thank you. So let me just say, this case was vigorously litigated below, and the jury verdict in this case achieved important public interests in prosecuting serious drug and gun crimes and some measure of justice for Tina and Patsy Crawford. But let me start with the sufficiency of the evidence on count nine. Judge Restrepo, I believe you asked what evidence was there that Patsy was going to be a witness here. Well, that Montgomery knew that he was going to witness- And that he shot her with the intention to prevent her from communicating. This was an exquisitely timed hit. Tina had gone to stay with her mother as- Exquisitely timed as to Tina. Your own submission is that Patsy, wrong place, wrong time. I would put it slightly differently, Your Honor, with respect. He knew that Tina was staying with her mother where she had been. We're in the record. I wasn't sure that that was established, that he knew that Tina was staying with- I would say, so Tequila Pritchard, Tina's fiance, testified that Tina had, in fact, gone to stay with Patsy some weeks before she was murdered. She told that to law enforcement earlier. Is that right? Well, she testified to that at the trial. Yes, Tequila did. And Tequila also testified that Krista Brown was serving, unfortunately for Tina in the end, as a go-between between Tina and Mr. Montgomery during this period of time. And the evidence suggests and shows, and it's certainly a reasonable inference, that Montgomery knew where to find Tina. He knew where to find her at her mother's house. And the murder of Tina also occurred literally on the way to the federal courthouse where Tina was going to be meeting with federal prosecutors. It was a very, very short time after the murder of Tina. It was within about, well, what we know is that it was within about 30 minutes after a text was sent, which we don't know the content of, from Krista Brown to Montgomery. Your paper's charge, prevent a person known to the grand jury from communicating information to law enforcement officer. What evidence is there supporting the contention that Montgomery knew, or had any reason to believe, that this woman, not her daughter, was a witness and that she was cooperating? Well, I would say that when you go to murder an important witness to your drug crimes. The witness there being Tina. Tina, correct. Why would you leave the witness who was six, nearly six feet from Tina alive? You wouldn't. That's a different issue, different crime, totally different scenario. Because there you're killing Patsy to prevent her from giving information about the killing of Tina. You're not killing Patsy to prevent her from giving information to the government about Montgomery's drug dealing. Correct. Absolutely, Your Honor. But given the proximity, I mean, the physical proximity of Tina and Patsy, I mean, they were shot and- Around the same car? They were literally on either side of the car in the garage. Now, we didn't, the jury saw some graphic photographs of the garage. I didn't, I mean, I wouldn't put that in the appendix, but it was certainly described. They were, their bodies were just inside the garage. We did put in photographs of the 24 cartridge casings that were found. I'm about to ask the number. I couldn't recall.  They went from the garage and out onto the driveway. Is that correct? Yes. There were 24 cartridge casings found, nine from that were 22 magnum, 15 that were nine millimeter. They were littered all over the driveway, especially clustered right at the door to the garage. And Patsy's, Patsy was shot and injured as you're facing the garage, just to the right of the car on the driver's side door, because it was pointed out. And Tina was shot and killed three times in the head, five times in the trunk on the left side of that car. So there, yes, there is inference necessary to conclude. Is it enough to overcome the bare rationality test? I mean, I don't think, I don't think that the defendants can overcome that. I mean, I think that test preserves the verdict in this case, Your Honor. Given the nature of this, um, hit, I would say, um, uh, let me move to, um, I guess going slightly reverse, unless Your Honor has any further questions on that. I just, it's not really relevant to our deliberation. Given the difficulty of the, in the nature of the crime you're trying to prove vis-a-vis what happened to Patsy, it just seems to me that this would have been such a different and much easier state prosecution than federal prosecution, but that's neither here nor there. Well, I mean, again, Tina, you know, Tina was on her way to meet with federal prosecutors. Tina was, no doubt about it. We're talking about Pat, I'm talking about Patsy. And Patsy was her, her ride. I mean, Patsy, unfortunately, you know. Enough. Her ride is different than somebody that's going to cooperate, just sit in front of the grand jury and testify. And Montgomery's got no words. She's giving her a ride too. Well, I believe, I believe the timing shows that he did. I mean, he, given the text 30 minutes before Tina, Tina was, she was minutes away from going to the federal courthouse. But it doesn't necessarily mean she's going to get, she, Patsy, is also going to get out of the car and go inside and do something more than just give Tina a ride. Correct. But we're not, and we're not saying that Patsy's, Patsy was going to testify about the drug conspiracy, but it is that Patsy would have, was a witness to Tina's murder. And, and given the, the way this hit was carried out, and again, the timing of it on the way to the courtroom, again, as I said, why would you leave the, the, the mother of the, you know, murder person or, but frankly, just anyone who is a mere feet from that murder alive. But they did. I'm sorry. But they did. Well, they did, but she was shot and critically injured. I mean, she, she fortunately survived. And again, again, even after she was shot, her first, I believe the testimony is that her first words were on the call 9-1-1 and what, what happened to my daughter. She wanted to know about her daughter. She wanted to know about her daughter. So, so going slightly in reverse order, let me talk about the, the Apprendi issue on count seven. I want to respond to one thing that opposing counsel said about notice. I just want to point out that two things on that. Number one, the charge in count seven, I would not suggest, I would push back on the idea that was just manslaughter. I mean, it charged the elements of the crime and that included first degree murder. And then second, as far as notice goes, I would point out. Counsel argue there's no charge with the malice of forethought. Well, I mean, as your honor said, I mean, count eight charged, charged first degree murder and the jury necessarily found that this was first degree murder. Now there can be, I don't want to say equivalent. I mean, there can be a dispute, a hypothetical dispute about the language of the jury instructions on what, what does willful, deliberate, you know, premeditated means. Those were the, I believe those were the words that were used, but that, that argument was waived. And I don't find that, I don't find willful, deliberate, premeditated, necessarily legal terms of art that a jury would need to have. I did homicide trials for three years and they would never have instructed a jury in a murder case without explaining to them what those things meant. Well, and the defense attorneys could have asked for that if they wanted, they didn't, they jointly submitted these instructions. And as your, as I believe Judge Smith was saying, they did object to some things and Judge Warnock engaged them in a discussion about those objections and those results. So there's no apprendee issue here because he was charged and he was convicted of first degree murder, which is enough to support the sentence. But just one more point on notice, I would note that at the same time, the second superseding indictment was filed, which I believe was April 4th, 2016. Our office did file on the public docket an indictment memorandum, which is sort of a practice that we do, which lays out the elements of crimes. It lays out punishments for crimes and it's, this is docket number 154 on page 13 of this document. It said mandatory life imprisonment, 18 USC 1512A3A as connected to the count seven, the potential punishment for count seven. So if you're going to look at the whole record and whether or not, you know, Mr. Montgomery could have not have been on notice somehow that life imprisonment was, you know, potential punishment. I don't think that's a winning argument that he can make at this point. So I just wanted to point that out. And you're conceding this is a sentencing error and not a trial error. Your honor, I don't, I, I sort of go back and forth in this. I would not concede that because to me, this does not really fit into the category. I mean, I see a sentencing error as something where something, I mean, if it's a trial error, if it wasn't charged, it's a sentencing error, if it was charged, but not found. So that's a result then? Well, your honor, I mean, I guess, I guess I'd come back to the fact that here. If it's a sentencing error, it is the result of the trial error, is that? It can be, is my understanding. I mean, the way these categories are, but I would just come back to the fact that it was, it was charged and it was found by a jury. So you're not, you're not in a situation like Lewis or Johnson where you're trying to, one is out and the other is out. So, I mean, here we have both, you know, both, both legs here to stand on. So for that reason, I don't think that the Apprendi issue is going to go anywhere on count seven. Moving to count five on the constructive amendment, it's invited error, number one, because again, the jury instructions were jointly submitted and agreed to. And, and I think that's enough to get rid of the issue, you know, to affirm, but I would actually like to respond a little bit more to the council's argument about sort of the evidence here. As the judgment key, you said, I think you might say you're maybe not a friend of harmless error, but, but isn't that, you know, isn't this harmless error given the, the evidence here? And I think there's much more evidence of Mr. Perrin's specifically involvement in the conspiracy and connection to the house over the period from January to June of 2014. It starts with the fact that he personally bought these guns from, you know, brokered through Jeremiah Paschuta, correct? There's also some evidence that Mr. Montgomery may have been present at that, but that was sort of not really established at trial. But, Mr. Perrin was the one who traded for them using a combination of heroin and cash. And the testimony from detective Molinaris, I think the very first witness at trial was that Mr. Perrin was not just sort of occasionally there or just there for 90 minutes on like on June 8th, 2014. He was there the second most frequently as Mr. Montgomery himself. And I believe Mr. Molinaris described him as being, being there frequently over the surveillance was being done at the house at 414 William Street. So, the guns were there. A reasonable inference would be from January, 2014, when they were bought up through June 8th, 2014, when they were found in the house. And Mr. Perrin and Mr. Montgomery, of course, were in and out of the house frequently is the testimony. Was the 22, this rare 22, was that ever recovered? It was not. It was not recovered. The gun was not recovered. The gun was not recovered. The Kel-Tec 22 was not recovered. There were a couple of other guns that were part of that Pachuta collection that were not recovered. Of course, there's evidence that that gun was used to kill Tina and or shoot Patsy because there was an identification made of a specific brand of 22 Magnum ammunition that Jacob Pachuta had had in his possession and then its way into Montgomery's house. But just to say that Mr. Perrin was frequently at this house and there was an argument that on June 8th, there's some risk the jury could have been convicting because of the evidence dating back to January, 2014, but the guns were in the house on that day when we know Mr. Perrin was in the house and Mr. Montgomery as well. So as far as the constructive amendment argument goes, it's waived as invited error and at best, it's harmless. I mean, the evidence was overwhelming, I would suggest. Moving to the wiretap argument, I would agree as we've said that this argument about personal review being necessary is untimely and that there is no good cause shown here. The argument from the other side is that it's a pure issue of law, but as United States versus Salk pointed out on a footnote, if that were enough to overcome the, to justify the rare, narrow, good cause exception, it would swallow the exception. If in this sequence of events, as is supported by Judge Hornak's findings of fact, the first deputy, Mr. King, was properly acting, whether it's Pennsylvania law, public policy, for whatever reason. I believe that there was some support in the record that I've lost my train of thought. I'm sorry, counsel, go ahead. I don't want to waste your time. Okay, your honor. Sure. Sorry. I have also, no, I've been contagious. Just briefly, I would say on the issue of personal review, I mean, I, you know, to address the merits briefly, Congress does know how and the Pennsylvania legislature also knows how to command personal review if that's necessary. What I was getting at when I lost my train of thought, that the findings of fact do support that King gave personal review. Absolutely, your honor. In fact, along with Chirba close by and in consultation, so there's no question that there was review of this application by the number one guy in the office, the head of the criminal division for some period of time. Correct, your honor. Agent testimony at the suppression hearing was that first deputy King asked detailed questions about as he was reviewing the 43 page affidavit. So I would agree with that a hundred percent. And, and, and, and, and besides the waiver of the federal law argument, as we explain our briefs, there's also state statutory authority that it compliments. It does not contradict the Pennsylvania wire tap act. And ultimately I, if I'm, if I may just conclude unless the panel's I come back to the idea that as, as, as your honors have said, the, the, the governing standard here in this wire tap issue is substantial compliance, core concerns. I don't understand. To me, those are different things because the core concern, which is clearly there may override the quote substantial compliance to the extent that substantial compliance might not satisfy one of the core concerns for primarily being political accountability. But if it's, if substantial compliance comes because one of the deputies are authorized and applied for the wire tap, but, and I'm not saying this is the case here, but that deputy did not have the kind of authorization required by the federal statute that would be substantial compliance, but it would be, it would not satisfy the core concern of title three of political accountability. Would it? It could your honor in that hypothetical. I mean, that to me sounds like Giordano where you had the executive assistant to the attorney general predicting, Oh, this is something in the age of Giordano where I'm thinking of, but I would assign, but I view that case is very different here because, but isn't there political accountability here because of the public policy expressed in the administrative code, as well as the commonwealth attorneys act of the authority of this deputy attorney general, the number one person. Yes. Yes. I, I can't, you know, I, I, the, the irony does not escape me here that it seems that the position of the defense is that the application was fraught with error, such as not to constitute substantial compliance because it was signed by the deputy attorney general, rather than the attorney general herself who ended up in prison two years later on perjury charges. I'm sorry. That is a real irony that strikes me in this case. I agree your honor. Unless the panel has any, that wasn't a question, more of a comment than a question. Uh, I, we would ask the court to affirm. Thank you. Thank you. Your honor, our argument is not that there was a lack of substantial compliance because a deputy signed the application. In fact, that's what we allow. How does it, how does it offend the core concerns of title three? I think exactly in the way that judge McKee was pointing out, the title three was designed to ensure political accountability by lodging wiretap authority exclusively in high level political officials, uh, in Giordano, which is, we say high level, that doesn't help you. It's gotta be the number one person. I say high level because for the feds, it's not only the it's Giordano addressed the federal provision. It was the attorney general as of 1974 is acting, uh, assistant attorney general is designated by the attorney general. You know, by contrast, title three, title three in the federal sphere does authorize the attorney general to delegate this responsibility. Uh, it, it, it, sure. To the named officials. There is both as a matter of reality and there is in the statute itself, a substantially more layered bureaucratic, uh, order, uh, indicating those who may be designated as opposed to the Pennsylvania statute. Well, as opposed to the paragraph two, but neighboring power, exactly. Yes. Yeah. But it says one, it's going to apply to 50 states, right? Where the person in charge may be very different as set forth in a state statute, uh, or however, uh, the, uh, the authority to seek a hard wire is permitted. Well, it's easy for Congress to set out what the federal system has to do. Not so easy for Congress to set out what should happen in 50 states. And rather than try to, they said the principal prosecuting attorneys, so as to limit the authority to do this. And while it may not violate that core concern for someone to sign an application, it does violate it for a deputy to be the one deciding the merits of whether title threes prerequisites are satisfied. Your honor, I would refer it. Let's stop right there because one point, I know I've not made one thing we haven't asked about. Uh, you just put all of the weight. It seems on the attorney, the, uh, the, the main attorney in the picture in whatever state in this case, not, uh, of some considerable importance is the fact that a judge has a place in all of this. I, uh, worked on a hard wire in some of the earliest days in Pennsylvania, back in the very early, back in the early eighties. Uh, and, uh, it's very serious matter that you get the papers together to get to whoever is the duty judge at the superior court. Uh, and that happened here, judge bows. Uh, there's no question by you, uh, in your papers or elsewhere that in any way, anything in this entire process was tainted or not pursued correctly, except for the signature and designation. Uh, and what you presume might not have been adequate attention and time spent on the application, but a judge was satisfied. Judge was satisfied. PC was there was for her to make that decision, right? Yes. The judge did decide that if I may respond to, I think there's both a kind of legal point and a factual point that your honors made, uh, legally, the fact that a judge signed off on this is under the terms of title three, not enough. And then the court simply need to read Girodano the face of it to understand that. I'm sorry, but a Seneca known for the process. Yes. Yes. You need the judicial approval, but Congress specifically, uh, created a bifurcated system where they entrusted these decisions at in the executive branch to the mature judgment of a politically accountable official in order to make true. And I grant you that this, that they are still political accountability has been raised. Political accountability. Uh, is that a question? Is that an issue when it comes to whether or not a judge who is involved in the process? And as I phrased it, a Seneca known, uh, is part of the political process. He, she is not right. So if we're talking about Congress intent, you, you can't possibly suggest, do you, that Congress was putting more faith in the prosecutorial apparatus here than in the judiciary. I would not suggest that the language of Girodano is that Congress wished to make doubly sure having the two levels of review. And I think there is a distinction between the sort of review a judge can do and that the attorney general can do. If the judge is presented with an application that shows probable cause shows necessity, the judge is bound to issue the wire tap. The judge doesn't have discretion to decide that it's inappropriate. And I think it's that aspect of the decision that Congress expected the chief prosecutor to weigh in on and make sure that an investigation was sufficiently significant to warrant the surreptitious interception of our most private communications. So there's a policy dimension to any wire taps that are judges not in a position to make the call on. And that's the call that Congress insisted the chief prosecutor and not her deputy make. Isn't it true that then attorney general Cain re-upped this, this, this, this, this wire tap several times? What do we make of that? Twice? Yes, she did re-up it in the government terms of ratification. And again, I have to point the court to Girodano where the precisely the same argument was made, as was the argument from Pennsylvania administrative statutes, looking to federal statutes, empowering the attorney general. And were rejected, squarely rejected by the Supreme Court. There is language in Giordano cited, quoted in our briefing that says Congress didn't leave it to the attorney general to take back applications. He decided after the facts were unwarranted, it said there needs to be authorization in advance. So the fact that Cain ratified it or went along with it afterward is I would submit by terms of Giordano, not... But, but it does as a credibility issue, lend support to other testimony in the case relative to the granting of authority to Cain, right? An inference can be drawn that she did not object. Right. It's But I do think that the record is clear. She didn't make personal review. And I would refer the court to page 314 of the appendix. You know, there, Mr. Chirba, who was discussed when my colleague was at the podium, described the sort of briefing that General Cain had at her weekly executive meetings. And Mr. Chirba specifically said, we didn't get too into the weeds. Right? That's at page 314. It was a general overview of what this investigation was. No doubt General Cain approved of it. It was an opioid trafficking investigation. That was a priority of hers. I'm not disputing that, but she didn't know... She sat in on executive meetings for a couple of weeks, a number of weeks before the authorization was made or not made as your position and before the, before the hardwire was sought, right? She was involved in the process... Didn't get into the weeds on it. And of course the... Well, I think the testimony is that they covered other matters during this. Correct. These were, you know, not more than at most a few hours and they're covering the office's entire operations, including its civil operations. So hypothetically, let's assume we agree with you. What do we do? I think that there would need to be a remand. And the next step would be a fairly intensive fruits analysis. We'd have to figure out exactly what is the fruit of the wiretap that would probably be different for one defendant or the other. And I think that would be a task for the district court on remand. Thanks. Thank you. Thank you, your honors. I would just like to make a few brief points about the apprendee on count seven. First, I want to stress the consequences of the government's argument that it doesn't matter because these elements were charged on county. First, I think that would read the incorporation requirement out of the federal rules. This court has recognized in cases like Stevenson that if a count is going to incorporate an element from another count, it must do so explicitly. Elements are not passed through an indictment by the quote was intra indictment osmosis. And so saying that it's OK as long as those elements are charged somewhere in the indictment would completely eliminate this requirement that they be expressly incorporated. Your honor, my friend also talks about the practice in his district of filing an indictment memorandum, and that is not sufficient to carry the air here in a lane. The Supreme Court talked about the fact that defendants have to be able to predict the legally applicable penalties from the face of the indictment. And indictment memorandums are not used everywhere in New Jersey. We don't really see those. And even though there was this memorandum in this case, it was simply stating the wrong statutory penalties based on what was charged in the indictment. So that does not cure the notice error in this case. Finally, Judge Smith, you you asked about whether this was sentencing error or trial error, I believe. And I would stress that this is sentencing error under Lewis, because like in Lewis, there was no defect with the indictment and there was no defect with the jury instructions on this count. The government simply chose to charge a less serious version, a lesser included version of witness tampering, the manslaughter version versus the murder version. And I know that my friend also mentioned that he believed that the murder was charged in this count, I believe. And that's simply not true, because 1512, 18 U.S.C. 1512, the witness tampering statute, it explicitly cross-references the murder statute and the manslaughter statute. But it was charged in count eight, though, wasn't it? Yes. Yes. Yes, Your Honor. So I understand you correctly. This is a sentencing issue, not a trial issue. Yes. Yes, Your Honor. And the reason is because there was no error in the indictment and there was no error with the jury instructions. And so the question then becomes whether it was imposed. And it was not harmless as the sentence imposed, because the district court believed that there was a mandatory life sentence when, in fact, there was a 15-year statutory maximum. And to give credit where it's due, it was Judge McKee who actually raised that question. I just kind of trailed along trying to understand. All right. All credit to Judge McKee. He knows me too well. Your Honor, very briefly, it also, this was an issue that came up earlier in the argument, but I just want to briefly hit on it. On the constructive amendment on count five, there was a question, and I don't remember which of Your Honors posed it, about whether it was harmless, whether any constructive amendment was harmless. I believe it was also Judge McKee, given the evidence. And I would make a few points. The first is that in order to show that a constructive amendment is harmless, the government has to show that it's harmless beyond a reasonable doubt, right? Because this is a constitutional error. So that is a demanding standard. And there's also a presumption of prejudice under the Syme case, even on plain error. So I don't believe that the government really even made an argument in its brief that this was harmless under the third prong of the plain error test. And I would suggest, Your Honors, that even though there was evidence that there were guns and drugs found together in a house on June 8th, mere proximity of guns and drugs, that is not sufficient to prove possession in furtherance of. There needs to be more than that. And I would suggest that's why, throughout the trial, the government's theory was that the weapons were possessed in furtherance of the conspiracy, not in furtherance of the possession charge that was actually charged. So with that, Your Honors, we'd ask that the court vacate the life sentence on count seven, enter a judgment of acquittal on counts nine and ten, and vacate the 25-year sentence on count eight. Thank you. Thank you. I'd just like to say this came apparent to me during some of my questioning. I would hope that no one interprets my questioning or any of my colleagues' questioning about the death of Tina, the killing of Tina, and the assault of Patsy as being unfeeling or cruel or cold. It certainly came across that way. But unfortunately, we only have to deal with the legal issues here. And to get to the legal issues, we have to ask questions in a way that can seem pretty callous sometimes. And I wouldn't want the form of our questions or the content of our questions to be interpreted as the fact that we don't appreciate the fact that a human being was killed, rather than was very seriously injured and could easily have been killed. And that's a real human tragedy. Absolutely. And I would echo that, Your Honor. Thank you. Thank you very much. Thank you very much, counsel, for your briefs and your arguments. Greatly appreciated. I'll take these cases under advisement.